IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 4:08CR3067 |
| ) | |
| v. ) | |
| ) | |
| GARY ZIERKE JR., ) | **MEMORANDUM AND ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before me for initial review[1] of the motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 motion") (filing 182). Gary Zierke, Jr. ("Zierke"), not to be confused with his son, Gary Zierke III ("Zierke III"), attacks his drug conviction and the 360 month prison sentence that resulted. Since it plainly appears that Zierke is not entitled to relief, the motion will be denied with prejudice.

Zierke makes four claims. (Filing 182 at CM/ECF pp. 4-5.) Summarized and condensed, these claims are as follows. *Claim One:* Based upon Zierke III's affidavit, Zierke III lied when he testified against Zierke and he did so because Zierke

---

[1] Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.

III had been threatened by the prosecutor and law enforcement agents. *Claim Two:* The government failed to disclose evidence that it used to corroborate the testimony of Tim Vorhees. *Claim Three:* Korey Reiman, appointed defense counsel, was ineffective because he refused to use the information about Zierke III (see Claim One) on appeal that had been discovered by Zierke after trial, but before the direct appeal was completed, even though Zierke informed Reiman of this information. *Claim Four:* Korey Reiman was ineffective because he failed to discover that "during the pre trial [sic], trial and penalty phase" Zierke had been committed to the Hastings Regional Center "for the mentally insane." (*Id*. at CM/ECF p. 5.)

## I. BACKGROUND

Zierke was charged in a two-count indictment with conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine between October 1, 2007, and April 17, 2008, in violation of 21 U.S.C. § 846, and distribution of methamphetamine on or about February 14, 2008, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1). Zierke's trial lasted four days and culminated with the jury finding Zierke guilty.

A United States Probation officer prepared a presentence report ("PSR"). (Filing 144.) With upward adjustments for a weapon, role in the offense and obstruction of justice, Zierke's total offense level was 39. His criminal history was extensive, racking-up 23 criminal history points even after I sustained an objection to a few criminal history points that should not have been counted. (Filing 152.) Zierke was also a career offender. I denied Zierke's primary objections and sentenced him to 360 months in prison. His Guidelines range (capped by the statutory maximum of 40 years) was 360 to 480 months in prison.

Regarding Zierke's mental health, the PSR reported the following:

> The defendant advised that he received mental health counseling through the Nebraska Department of Corrections, but denied suffering from depression or current suicidal ideation. Records from Mr. Zierke's Nebraska Department of Corrections classification study show that he indicated he participated in anger management counseling and was prescribed Klonipin to "control his temper."
>
> Mr. Zierke's classification study also indicated that although he had not received any misconduct reports, he "has an extensive record of violence, which includes assaults on correctional or police officers." It further explained that "Mr. Zierke is viewed as a predatory offender but he is not likely to become a victim."
>
> (Filing 144 at CM/ECF p. 23, ¶¶ 115-116.)

The PSR also recounted statements Zierke made to the Pretrial Services officer regarding his mental health. He told the officer that he received substance abuse treatment in prison, as well as outpatient treatment in Lincoln, Nebraska, while he was on work release in 2007. (*Id*. at CM/ECF p. 24, ¶ 122.) Zierke made no claim that he had been hospitalized in a mental institution. The PSR, submitted to the Court on March 23, 2009, also indicated that Zierke had been continuously detained on a federal warrant "since April 29, 2008." (*Id*. at CM/ECF p. 1.) There was no indication that Zierke was taken to a mental institution while in federal custody.

In short, there was no indication in the PSR or the other court records that Zierke had ever been committed to the Hastings Regional Center at any time while this matter was pending. Incidentally, Zierke made no objections to the foregoing portions of the PSR. (E.g., filing 137.)

Before I sentenced him, and as was his right, Zierke spoke at length. (Filing 161 at CM/ECF pp. 41-50.) He never claimed to have mental problems or to have been committed to a mental institution. With cool bravado, he did state that during the 27 years he had been in prison, he was consistently and intentionally violent and

this violence resulted in numerous mental health sessions during his incarcerations. My observation of Zierke was that he was fully oriented to time, place and person, that he was composed and that his speech was coherent.

Indeed, Zierke seemed to relish the opportunity to speak, boasting, for example, that he had not bought drugs from some of the witnesses as they had testified, but rather he had stolen the drugs from those witnesses because they were weak and because they feared him. The only remorse Zierke expressed was regarding a recorded conversation with his son (detailed below) while Zierke was in jail on these charges. Zierke admitted suggesting to his son that he would "like to see [the witnesses'] asses whipped." Zierke stated that he should not have placed his son "in a place to where he might have to go hurt somebody." (Filing 161 at CM/ECF p. 49.)

The evidence against Zierke was overwhelming. The government presented evidence related to law enforcement interviews with Zierke while he was incarcerated in the Nebraska Department of Corrections in 2006 and 2007. In an interview with Special Agent John Dougherty of the FBI, Zierke expressed his willingness to sell methamphetamine to aid the government in its gang interdiction efforts. When the government balked at the proposal, Zierke told the agents that he would proceed to sell the methamphetamine anyway when he got out of prison.

The government also had a tape recording of an October 31, 2008 phone call Zierke made to his son, Zierke III, while the defendant was incarcerated in the Douglas County Department of Corrections.[2] Zierke's comments to his son indicated a desire that the young man harm cooperating witnesses and the recording made clear that Zierke III was "knee deep" in Zierke's drug business, to wit:

---

[2] The phone call was recorded by jailors as a part of their standard practice.

03:06

Zierke – Hey Junior[3] listen to me, listen to me ok!

Zierke III – Yeah

Zierke – Cus I don't ev. cus I don't ever have a chance to talk to you. Listen to me.  That Fuckin Puta he works at Tommy's.

Zierke III – Yeah

Zierke – He works at Tommy's and the others in Chapman.  Ok.  You already know where the other bitch lives.

Zierke III – Yep

Zierke – Now how the fuck am I (inaudible - breaks up) huh.

Zierke III – Inaudible

Zierke – Listen, listen to me, yea because of them.  (Inaudible) still in jail?

Zierke III – I don't know.

Zierke – If things were diff (breaks up) you would not be in jail.

Zierke III – Yeah

Zierke – You know what I mean?

Zierke III – Mm hum

End 3:43

---

[3] "Junior" was Zierke III's nickname.

11:46

Zierke – Listen, Trejo did a pre-proffer prosecution.

Zierke III – I know.

Zierke – Just got done talking in front of the Grand Jury, who knows what he said. Nani, she's a rat. Machelle, you know she's a (sounds like it breaks up) tonight's trick or treat, you know what I mean.

Zierke III – Yea

Zierke – Um, Tim Vorhees he fucking told on me. You know what I mean?

Zierke III – Yea

*Zierke – Now I don't know how many fucking times I (breaks up) tell you guys and tell you guys why am I still in jail? You know what I mean?*

*Zierke III – Yea, well fuck em you want me to take care of them. Then fuck em I will!*

*Zierke – I mean Junior, I don't even, I shouldn't even have to say it.*

*Zierke III – Alright*

*Zierke – You know what I mean? I shouldn't even have to, I shouldn't have to say nothing. I shouldn't have to say nothing. You know what, let me tell you, If you were in here. When I'm on the street you want so bad to be with me, you want so bad to do this and so bad to do that*, which isn't wrong, but when it comes down to this right h(breaks up). Ill tell you something I have been in this shit right now for 30 fucking years. If it was the other way around, It would be a, you wouldn't even be here right now, you wouldn't of did 1 month. And that's and that's the truth of the matter. That's why I tell you when I don't ever really

like you to be this and that because I don't want to have to expect something, *now I expect something from you.*

*Zierke III – Alright*

*Zierke – You know what I mean?*

*Zierke III – Yea.*

End 13:10

([Ex. 15B](Ex. 15B)) (emphasis added.)

Investigator Bradley Hand of the Nebraska State Patrol testified about a controlled purchase of methamphetamine from Zierke on February 14, 2008. Police officers executed a search warrant at Zierke's residence the day of the controlled purchase where they recovered several baggies, some of which were empty and others contained drug residue. They also recovered a glass pipe and a torch–used to smoke methamphetamine–among other items. Investigator Richard Conrad of the Hall County Sheriff's Department testified about the warrant search of Zierke's home and evidence obtained. Investigator Mark Wiegart of the Grand Island Police Department's tactical response team also testified about the search, including methamphetamine found in Zierke's pocket.

Putting to one side for a moment the testimony of Zierke III, five other percipient witnesses testified to doing drug deals with the defendant. Timothy Vorhees testified about his controlled purchase of drugs from Zierke, as well as prior purchases. Lance Thomas testified that he purchased methamphetamine from Zierke several times. Sonia Martinez testified that she sold methamphetamine to Zierke for him to resell from December 2007 to January 2008. Machelle Sanchez testified that she supplied Zierke with methamphetamine. Kellie Svoboda testified about selling Zierke methamphetamine on a daily basis in the months of October and November of 2007.

Vorhees testified that the night prior to the controlled purchase, Vorhees received approximately a half-gram to three-quarters of a gram of methamphetamine from Zierke on a front. Vorhees also testified that he first began purchasing methamphetamine from Zierke around December 2007. Vorhees further stated that he bought "8-balls"–3.5 grams–of methamphetamine from Zierke on two occasions; one purchase occurred during the controlled buy. Vorhees also testified that he once bought a "teener"–1.75 grams–from Zierke.

Thomas testified that he began purchasing methamphetamine from Zierke around Christmas of 2007. Thomas purchased approximately 3.5 grams of methamphetamine from Zierke on several occasions, but not more than six times. Thomas described a purchase of drugs from Zierke where the defendant pulled a gun out of his waist band and laid it on the dresser near them.

Martinez testified that she sold 8-balls of methamphetamine to Zierke daily for one-and-a-half to two weeks beginning in early November 2007. Martinez further testified that on four or five occasions, she sold Zierke two 8-balls–7 grams–in a day. Martinez also explained that on six or seven occasions from December 2007 to January 3, 2008, she sold Zierke half-ounce amounts of methamphetamine. Martinez also testified that from December 2007 to January 2, 2008, she sold 8-balls to Zierke. Finally, Martinez said that on seven or eight occasions from December 2007 to January 3, 2008, Martinez bought half ounces of methamphetamine from Zierke, but that once or twice it was an 8-ball short.

Sanchez testified that she sold methamphetamine to Zierke from approximately the end of November 2007 until about three weeks prior to her arrest on February 14, 2008. For the first two to three weeks, Sanchez was selling Zierke two 8-balls at varying rates–from more than once per day to once every few days. Sanchez further testified that starting in December 2008, she sold Zierke half ounces of methamphetamine at varying frequencies–from daily to every few days. Sanchez also

testified that she sold him one ounce of methamphetamine on a rare occasion. Sanchez finally stated that she sold Zierke an 8-ball on February 14, 2008.

Svoboda testified that starting in mid-October to November 27, 2008, she sold Zierke 8-balls of methamphetamine daily. Svoboda further testified that Zierke would often return a second time in the same day. Svoboda also testified that she sold Zierke half-ounce amounts of methamphetamine on two or three occasions. Finally, Svoboda said that starting in mid-January, she sold Zierke an 8-ball a couple of times and gram quantities on other occasions.

The sixth percipient witnesses to testify against Zierke was his son. Zierke III testified that he saw Zierke selling methamphetamine every day after he began living with his father. Zierke III also stated that at least as early as December 2007, he was selling methamphetamine for Zierke every day. Zierke alone supplied Zierke III with methamphetamine. Zierke III said that he would sell about an 8-ball or two per day for Zierke. Zierke III and Zierke also used methamphetamine together. Zierke III, like Thomas, stated that the defendant pulled a gun out while the defendant was dealing with Thomas and placed it on a dresser.

Zierke appealed and Korey Reiman, appointed trial counsel, also represented Zierke on appeal. The Court of Appeals denied the appeal and affirmed his conviction and sentence on August 24, 2010. *United States v. Zierke*, ---F.3d---, No. 09-2005, 2010 WL 3307366 (8th Cir. Aug. 24, 2010) (affirming conviction and sentence and holding that (1) admission of a recorded telephone conversation in which defendant intimated his desire that his son harm witnesses that defendant believed had turned against him, was not an abuse of discretion; (2) evidence was sufficient to establish that defendant was involved in a conspiracy to distribute methamphetamine; (3) drug quantity determination was not clearly erroneous; and (4) evidence was sufficient to support imposition of a leadership role as a sentencing

enhancement). The mandate of the Court of Appeals was filed in this court on September 14, 2010. (Filing 185.)

Prior to the decision of the Court of Appeals, and on January 11, 2010, Zierke filed a document in the District of Nebraska Clerk's office that appears to be a copy of a notarized statement authored by Zierke III and dated December 2, 2009. (Filing 167 at CM/ECF p. 2.) It reads in substance as follows:

> I Gary A. Zierke III am writing you a notarized [sic] letter and these are my words, alone.
>
> This is concerning the case of Gary Zierke Jr. I took the statnd [sic] on this day and gave a statement that was untrue. The reason for taking the stand was because I was scared and I was threatened by the lead agents and the prosecution. They said that if I did not make these statements and help with the prosecution of my father, I would be faced with many charges and much time.
>
> Due to these threats and presure [sic] and the threat of a largeer [sic] sentence, I felt that I had no choice but to lie in the trial of Gary Zierke Jr.
>
> I know that when I took the stand and lied, I committed purgery and am willing to do the time for that, as well as forfiet [sic] any deal that I recieved [sic]. Gary A. Zierke Jr. does not deserve to be in prison for the lies that I told, and should be given a fair trial without the influence of lies by his own son.
>
> *Id.*

On August 18, 2010, Zierke filed additional papers. (Filing 169.) Among other things, those papers included a copy of a letter from the Nebraska Counsel on Discipline, the lawyer assigned by the Nebraska Supreme Court to investigate state ethics complaints.

The letter described a state ethics complaint[4] filed against the prosecutor concerning Zierke's allegation that Zierke III testified falsely while under threats from the prosecutor and law enforcement. The Counsel on Discipline, after reviewing the response of the prosecutor, concluded that Zierke's allegations "are without merit and could not be supported by clear and convincing evidence . . . ." (Filing 169 at CM/ECF p. 6.)

## II. ANALYSIS

My analysis need only be brief. Zierke's claims have no merit.

*Claim 1–Zierke III Lied Because He Was Threatened By The Government*

Zierke claims that the affidavit submitted by his son, Zierke III, establishes that the boy lied because the prosecutor and law enforcement officers threatened the

---

[4] In the future, I advise the United States Attorney and her assistants to consider whether to seek a protective order from this court where the Nebraska Counsel on Discipline commences an investigation of ethical complaints lodged by a defendant against a prosecutor regarding an alleged ethical violation centering on conduct occurring in a *federal case*. This court has asserted jurisdiction over such matters. *See, e.g.*, NEGenR 1.8(d). This court has also adopted its own ethical standards and we have explicitly declined to adopt other codes of professional responsibility such as those promulgated by the State of Nebraska. NEGenR 1.7(b)(2). Furthermore, this court determines whether a member of the bar of this court should be appointed to investigate or prosecute a complaint of ethical violations occurring in this court, and no lawyer (including the Counsel on Discipline) is authorized to investigate or prosecute complaints of ethical violations occurring in this court without an order of appointment issued pursuant to our rules. NEGenR. 1.8(d)(4)(B) & NEGenR. 1.8(d)(8). To be clear, however, this footnote is not intended as a criticism of the Nebraska Counsel on Discipline or the Nebraska Supreme Court. I have the utmost respect for both.

young man. That claim, and the assertions in the supporting affidavit, are preposterous.

First, I heard and saw Zierke III testify. From that observation, I recall no reason to think that Zierke III was particularly frightened or was testifying with any motive different from any other cooperating witness. Second, Zierke III's testimony–that he was involved in a drug business with his father–is extensively corroborated by the record. For example, Zierke III recalled his father displaying a weapon during a drug transaction and placing it on a dresser when dealing with Thomas. So did Thomas. Moreover, the taped conversation between Zierke and Zierke III convincingly establishes that the defendant and his son were in the drug business together, and that Zierke treated Zierke III as his puppet in that enterprise. Third, recantations by a witness who has given testimony under oath and who has been subject to cross examination are viewed with great suspicion, especially when the recantation involves a family member such as Zierke III.[5] Fourth, Zierke III's affidavit is general in nature. It contains no specifics. For example, one cannot tell from the affidavit whether the whole of the trial testimony was supposedly false or only part of it. Blanket recantations carry far less weight, particularly when they fail to address a recanting witness's specific trial testimony, and that is even more true where that specific trial testimony is corroborated by other trial evidence. Fifth, Nebraska's Counsel on Discipline investigated the claim that the prosecutor had procured perjured testimony from Zierke III by threat. He found that claim to have no merit. Sixth, given the overwhelming evidence against Zierke, and excluding the testimony of Zierke III, there is no doubt that Zierke would have been convicted. There is also no doubt that Zierke would have received the same sentence. In particular, I note that the tape-recorded conversation between Zierke and his son, obtained independently of Zierke III, would have been sufficient to prove the

---

[5] Zierke III displayed no animus toward his father when he testified. In fact, he testified that Zierke "was the only one who cared about me, really." (Filing 133 at CM/ECF p. 168.)

enhancement for role in the offense. The government did not need the testimony of Zierke III for that purpose.

In summary, after a thorough review of the files and records, I reject Zierke's first claim because it is refuted by the files and record and because I find Zierke III's affidavit to be incredible. I also conclude that an evidentiary hearing is unnecessary regarding that claim. *See*, *e.g.*, *Wadlington v. United States*, 428 F.3d. 779, 783-84 (8th Cir. 2005) (trial court did not abuse its discretion in denying a § 2255 motion and refusing to hold an evidentiary hearing where the judge who heard the motion was also the trial judge and had an adequate basis for determining that the recantations were not credible).

*Claim 2–Government Failed To Disclose Evidence Used To Corroborate The Testimony Of A Government Witness*

The second claim is hard to decipher. Seemingly, Zierke claims that the government failed to disclose evidence that the government used to corroborate the testimony of Timothy Vorhees. It is unclear specifically what evidence Zierke contends should have been disclosed by the government or what provision of the law Zierke thinks was violated by the alleged non-disclosure. It is clear that Zierke's counsel had been given discovery material regarding Vorhees and that defense counsel used some of it to impeach Vorhees. (E.g., filing 132 at CM/ECF p. 29-30.) Still further, there is nothing in the record to show that the government failed to meet its *Brady* or *Giglio* obligations. Additionally, there is no reason to think that the government failed to meet its obligations under the Jenks Act. And, most importantly, there is no reasonable probability that the government's failure to disclose the alleged information (whatever that might have been) undermines confidence in the outcome of the trial. After all, Vorhees was only one witness in the tsunami of evidence establishing beyond any reasonable doubt that the defendant was guilty as charged.

*Claim 3–When Prosecuting the Appeal, Defense Counsel Was Ineffective Because He Refused To Use The Information about Zierke III Lying*

In order to prevail on his claims that defense counsel rendered ineffective assistance of counsel, Zierke must show that "'counsel's representation fell below an objective standard of reasonableness,'" and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nguyen v. United States*, 114 F.3d 699, 703-04 (8th Cir. 1997) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). Furthermore, an evidentiary hearing is unnecessary if the defendant makes an insufficient preliminary showing on either or both prongs. *See*, *e.g.*, *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995) (affirming denial of § 2255 motion without a hearing in the face of an ineffective assistance of counsel claim). In particular, no evidentiary hearing is required in cases involving the allegation of ineffective assistance of counsel where: (1) the allegations accepted as true would not entitle the defendant to relief or (2) the allegations cannot be accepted as true because they are (a) contradicted by the record or (b) inherently incredible or (c) conclusions rather than statements of fact. *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005).

There are two reasons why this claim must be denied. First, I find and conclude that there was no malpractice, assuming (without deciding), that defense counsel was aware of and failed to raise on direct appeal the issue of Zierke III's alleged lie. The Supreme Court has held that defense counsel assigned to prosecute an appeal from a criminal conviction does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). Here, there were compelling reasons not to raise the "Zierke III" argument because, as demonstrated earlier, the argument is laughable and because it would have only served to punctuate Zierke's control over Zierke III. In short, counsel was exercising sound appellate strategy in the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). *See also*

*Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005) (affirming denial of § 2255 motion and holding that the Sixth Amendment right to effective assistance of counsel does not require appellate counsel to raise every potential issue on appeal and the court would assume that, absent contrary evidence, appellate counsel's failure to assert an issue was an exercise of sound appellate strategy). Second, because the argument was so weak, there was no prejudice in failing to press that losing issue on appeal. Thus, Zierke's claim of ineffective assistance of appellate counsel fails on both the first and second prong of *Strickland*.

### *Claim 4–Trial Counsel Was Ineffective For Failing to Discover That Zierke Was Committed To A Mental Institution While This Case Was Pending*

The assertion that Zierke's trial counsel was ineffective–because he failed to discover that his client had been committed to a mental institution during the prosecution and sentencing phase of this case–is easily resolved. First, the record affirmatively refutes that claim and, moreover, it is inherently incredible. That record includes, among other things, a presentence investigation that found no such hospitalization. Moreover, Zierke's own statements to the Pretrial Services officer omit such an assertion. Second, even if Zierke had been committed to a mental institution at some time in the past, that fact alone would be meaningless, particularly given the perfectly sane (but chilling) statements that Zierke made to me immediately prior to the imposition of sentence. From the trial evidence, the presentence report, and otherwise, it is clear that Zierke is a cold and calculating predator who was perfectly competent. It is also plain that Zierke was entitled to no leniency beyond the low-end sentence that I imposed even if he had been hospitalized at an earlier date. In sum, zealous and dedicated counsel was not ineffective regarding the "mental institution" claim, and, even if he was, there is no showing of prejudice.

Accordingly,

IT IS ORDERED that:

1. Zierke's § 2255 motion (filing 182) is denied and dismissed with prejudice.

2. A separate judgment will be issued.

September 15, 2010.

BY THE COURT:
*Richard G. Kopf*
United States District Judge

---

\* This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.